IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA


JOSEPH N. TURTURRO, *ADMINISTRATOR*    :
*OF THE ESTATE OF ADAM B. BRADDOCK,*    :
*DECEASED*, ET AL.    :
    :    CIVIL ACTION
    v.    :
    :    NO. 10-2460
UNITED STATES OF AMERICA, *FEDERAL*    :
*AVIATION ADMINISTRATION*, ET AL.    :


**SURRICK, J.**        **AUGUST  22 , 2014**


## MEMORANDUM

Presently before the Court are Defendant United States of America and Defendant Agusta Aerospace Corporation's Motions for Summary Judgment (ECF Nos. 92, 98).  For the following reasons, the Motions will be granted.

## I.     BACKGROUND

### A.     Procedural Background

These consolidated cases arise from an airplane crash that caused the death of flight instructor Adam Braddock and his student Charles Angelina.  Plaintiffs are Joseph Turturro, the administrator of Braddock's estate, and Charles and Virginia Angelina, representatives of Angelina's estate.  As a result of the crash, Turturro and the Angelinas filed separate but similar Standard Form 95s ("Form 95s") with the Federal Aviation Administration ("FAA").  *Turturro v. United States*, Nos. 10-2460, 10-3063, 2012 WL 1758154, at *1 (E.D. Pa. May 17, 2012).  On June 17, 2012, the FAA denied both administrative claims.  *Id.* at 2.

Turturro and the Angelinas filed lawsuits on May 21, 2010 and June 24, 2010, respectively.[1]  In their Second Amended Complaint, Plaintiffs assert claims against the Government for negligence (Count I), spoliation of evidence, obstruction of justice, and unconstitutional violation of due process (Count II), and against Agusta Aerospace Corporation ("Agusta Corp.") for negligence (Count III) and breach of contract (Count IV).  (Second Am. Compl.)  On June 1 and 2, 2011, the Government moved to dismiss the Second Amended Complaint for lack of subject matter jurisdiction.  (ECF Nos. 34, 36.)  We denied the Government's motions, finding that the Form 95s filed by Plaintiffs properly put the Government on notice of the claims that Plaintiffs ultimately included in the Second Amended Complaint. *Turturro*, 2012 WL 1758154.

On August 31, 2012, the Government and Agusta filed the instant Motions for Summary Judgment.  (Agusta Corp.'s Mot., ECF No. 92; Agusta Corp.'s Mem., ECF No. 93; Gov't's Mot., ECF No. 98.)  On November 30, 2012, Plaintiffs filed a joint Response in opposition to the Motions.  (Pls.' Resp. to Gov't, ECF No. 114; Pls.' Resp. to Agusta Corp., ECF No. 127.)  On

---

[1] The procedural history of these cases is complex.  For an outline of the numerous lawsuits that have been filed based on the same underlying airplane accident, *see Turturro v. Agusta Aerospace Corp.*, No. 10-2894, 2010 WL 3239199, at *1 (E.D. Pa. Aug. 13, 2010).  It is sufficient to note that Turturro and Angelina brought separate suits against Agusta Corp. in the Court of Common Pleas of Philadelphia County.  Agusta Corp. then filed third-party joinder complaints against the Government.  On June 16, 2010, both cases were removed to this Court. The Government filed motions to dismiss for lack of subject-matter jurisdiction, which were granted in both matters.  *Turturro*, 2010 WL 3239199; *Angelina v. Agusta Aerospace Corp.*, No. 10-2895 (E.D. Pa. June 16, 2010).  Turturro and Angelina then filed new cases.  On October 15, 2010, these two actions—*Turturro v. United States*, No. 10-2460 (E.D. Pa. May 21, 2010) and *Angelina v. United States*, No. 10-3063 (E.D. Pa. June 24, 2010)—were consolidated for all purposes under Civil Action Number 10-2460.  (ECF No. 22.)  The substantive facts alleged in the Turturro Second Amended Complaint (Second Am. Compl., ECF No. 33) are, for the most part, identical to those alleged in the Angelina Second Amended Complaint (No. 10-3063, ECF No. 23).  For the sake of simplicity, we will refer to the allegations in the Turturro Second Amended Complaint unless otherwise noted.

January 25, 2013, both the Government and Agusta filed a Reply. (Agusta Corp.'s Reply, ECF No. 145; Gov't's Reply, ECF No. 157.) On July 23, 2013, the Court heard oral argument on the Motions. (July 23, 2013 Hr'g Tr., ECF No. 164.)

**B.      Factual Background**[2]

On May 22, 2008, Angelina was taking flight lessons from Braddock in a small aircraft, a Grumman AA-1C airplane (the "Grumman") at the Northeast Philadelphia Airport ("the Airport"). (Pls.' Resp. to Gov't. 2.) Braddock was in the right seat and Angelina was in the left. (*Id*. at 3.) Angelina had 87 hours of flight time in the Grumman, while Braddock had approximately 800. (*Id*.) Angelina was in the final stage of his training. (McGrath Dep. 61-64, Pls.' Resp. to Gov't Ex. 1.)

Braddock was employed by Hortman Aviation Services, Inc. ("Hortman"), which operates an FAA approved flight training school based at the Airport. (Pls.' Resp. to Gov't 3.) At the time of the crash, there were three air traffic controllers ("Controllers") in the Airport Tower: Jennifer Richburg (who was working local control); Joseph Fabozzi (who was working ground control); and Jonathan Swingle (who was acting as Controller-in-Charge and overseeing Richburg and Fabozzi). (*Id*. at 5.) Richburg categorized her workload during this time as "light to moderate" based upon the number of aircraft in flight at the time. (Richburg Dep. 271, Pls.' Resp. to Gov't Ex. 5.) The Air Traffic Manager at the Airport, Edward Wolfe, also described Richburg's traffic workload and complexity as "light to medium." (Wolfe Dep. 12-13, 193, Pls.' Resp. to Gov't Ex. 18.)

---

[2] We view of all of the facts and draw all reasonable inferences in the light most favorable to Plaintiffs, the non-moving party. *P.N. v. Clementon Bd. of Educ.*, 442 F.3d 848, 852 (3d Cir. 2006).

The Airport has two intersecting runways—Runways 24 and 33.  (Airport Overhead, Agusta Corp.'s Mot. Ex. 1.)  At the time of the accident, the pilots of the Grumman were performing touch and gos.  (Pls.' Resp. to Gov't 4.)  During a touch and go, an aircraft lands on a runway and takes off again without coming to a complete stop.  The pilot enters into a traffic pattern, circles the airport, communicates with air traffic control ("ATC") for clearance, and then repeats the process.  (*Id.* at 3.)  Circuits can be done to either the left ("left traffic") or to the right ("right traffic").  (H. Hortman Dep. 34-35, Gov't's Mot. Ex. A.)  The standard traffic pattern in the United States is left traffic, and right traffic is an alternate traffic pattern.  (*Id.* at 34.)

Angelina's first touch and go was performed on Runway 24.  (Accident Tr. 3, Gov't's Mot. Ex. D.)[3]  A few minutes later, at 1543:35, while the Grumman was preparing for its second touch and go, ATC instructed it to "set up for left traffic runway three three report turning downwind."  (Accident Tr. 4.)  Richburg informed the Grumman at 1553:20 that there was "one departure off runway two four prior to your arrival," but did not identify the nature of the aircraft that was departing.  (*Id.* at 5.)  The aircraft that Richburg was referring to was Exec Jet 802 (the "Exec Jet").  (Pls.' Resp. to Gov't 50-52.)  The Exec Jet departed from Runway 24 approximately two minutes and thirty seconds before the Grumman performed its second touch and go.  (*Id.* at 52.)

While the Grumman was preparing for its second touch and go, the Agusta was hovering near taxiways "G" ("Golf") and "J" ("Juliet").  The Agusta was operated by Agusta Corp. flight instructor Steven Farr and his customer training pilot, Alan Baldwin, and was preparing to depart

---

[3] A transcript prepared by the FAA was a partial transcript of the communications between the pilots of the Agusta 139 helicopter (the "Agusta"), the pilots of the Grumman, and ATC.  Plaintiffs' ATC expert  Richard "Pete" Burgess prepared a more complete transcript of all communications after listening to the audiotape of the communications.  (Burgess Decl., Pls.' Resp. to Gov't Ex. 23-D.)

on a training flight of its own. (Pls.' Farr Dep. 155-156, Pls.' Resp. to Gov't Ex. 2.)[4] Farr and

Baldwin were both very experienced pilots in both helicopters and fixed wing aircraft. Agusta

Corp. pilots routinely conduct flight operations in and out of the Airport, including training

flights, and the pilots are aware that flight school training operations occur on a regular basis.

(Pls.' Farr Dep. at 73.)

Prior to commencing flight, the Agusta was ground taxied. The pilots requested

permission to leave the ground to perform hover check maneuvers. (*Id.* at 155-56.) After these

hover checks were completed, the Agusta requested clearance from ATC to commence forward

flight in a westerly direction. (*Id.* at 181-82.) Farr requested a westerly departure because the

Agusta was headed to Lancaster, Pennsylvania, which is west of the Airport, and because the

pilots wanted to take off into the wind (*id.* at 41, 184), which was traveling out of the

west/northwest at 8 knots (Pls.' Resp. to Agusta Corp. 21 n.7; Agusta Corp.'s Reply 4 n.3).

Richburg understood the Agusta's request for a westerly departure to mean that the Agusta

wanted to depart out of the west. (Richburg Dep. 201.) Farr testified that by westerly departure

he meant 270 degrees, which is due west. (Pls.' Farr Dep. 182.) Baldwin, who was flying the

helicopter, thought the flight path of the Agusta was northwest bound. (Pls.' Baldwin Dep. 57,

Pls.' Resp. to Agusta Corp. Ex. 10.)

At 1553:44, Richburg told the Grumman "altitude and speed permitting make right traffic

runway three three." (Accident Tr. 5.) The Grumman pilots informed Richburg that the

Grumman was left downwind. (*Id.*) Richburg responded, "five five uniform disregard that call

---

[4] The Agusta is a large five-bladed, fifteen-seat transport category helicopter. (Pls.' Farr
Dep. 43-44.)

correction seven six mike make right traffic runway three three." (*Id.*)[5]  At 1557:24, Richburg

radioed the Agusta pilots and inquired "do you have that grumman off your left on uh runway

three three?" (Accident Tr. 5.)  The Agusta responded, "we got the grumman in sight." (*Id.*)  At

1557:30, Richburg informed the Agusta that the "grumman will be in a left downwind departure

from Gulf and Juliet . . . ." (*Id.* at 6.)  Richburg then cleared the Agusta for takeoff and

instructed the pilots "proceed on course . . . ." (*Id.*)  Within approximately five to ten seconds of

receiving clearance, the Agusta commenced forward flight to the northwest.  (Pls.' Farr Dep.

134, 139-40.)

At 1557:55, as the Grumman was climbing out after its second touch and go, Richburg

instructed the Grumman to "make right traffic."  (Accident Tr. 5.)  Seconds after receiving the

instruction, the Grumman initiated its turn at an altitude of 200-300 feet.  (Richburg Dep. 236; C.

Hortman Dep. 39, Gov't's Mot. Ex. E; Agusta Corp.'s Baldwin Dep. 94, Agusta Corp.'s Reply

Ex. F; July 23, 2013 Hr'g Tr. 49, 60.)  Prior to the turn, the Grumman was observed climbing at

an abnormally slow speed.  (Pls.' Farr Dep. 150-51; Farr Accident Report 1, Agusta Corp.'s Mot.

Ex. 4; Gov't's Baldwin Dep. 36, 106, Gov't's Mot. Ex. B; C. Hortman Dep. 19-20, 27, 36, 78-

79.)  Farr witnessed the Grumman's "nose move right, vice left in a shallow bank angle."  (Farr

Accident Report 1; Pls.' Farr Dep. 151.)  Baldwin observed that the "aircraft's nose started to

come right with about 15˚ of bank."  (Baldwin Statement, Pls.' Resp. to Agusta Corp. Ex. 14.)

The Grumman then began to bank more sharply, at an angle of almost 80 to 90 degrees.  (Farr

Accident Report 1; Baldwin Statement 14.)  Baldwin testified that:

---

[5] At her deposition, Richburg clarified that the instruction was actually intended for 76
Mike, another aircraft in the traffic pattern.  (Richburg Dep. 183-84.)

> The initial right-hand turn was fine in the way it looked. It looked a little uncoordinated, but as soon as the aircraft came around and the nose dropped and it was truly, for lack of a better description, like a kite on a string as it came down. There was no – there was no forward momentum to cause any type of lift ultimately.

(Gov't's Baldwin Dep. 33-34.) Another eyewitness, Cameron Hortman, described the last few moments of the Grumman's takeoff and turn as follows:

> Was out checking the dipstick on my tomahawk. Saw [the Grumman] touch down, put the dipstick back in, looked up, saw an Agusta helicopter hovering off the right (no factor), looked back, saw [the Grumman] lift off. Not more than a hundred yards or so past the threshold and no higher than 200 ft. The plane went vertical to the point where I could see the red nose cone. The plane kicked hard right. Looked like the takeoff stalls I would practice but they also had the right turn with the high angle of attack added in. After the plane kicked hard right, it came down on an angle on its side and went behind the trailers where I could no longer see the plane.

(C. Hortman Statement, Agusta Corp.'s Mot. Ex. 5.)

The Agusta pilots were surprised by the Grumman's right-hand turn because they had expected the Grumman to make left traffic based on ATC's instruction at 1557:30. They had not heard the "make right traffic" instruction at 1557:55. (Pls.' Farr Dep. 126, 141-42; Pls.' Baldwin Dep. 66.) The Agusta pilots were further surprised by the fact that the Grumman initiated its turn at such a low altitude. Baldwin uttered "[w]hat the fuck," because he expected the Grumman to turn left, not right, and did not expect the Grumman to turn at an altitude of 200 feet above the ground. (Agusta Corp.'s Baldwin Dep. 94.) Farr testified that "[w]e saw the aircraft move to the right, we both anticipated it moving to the left, and we both kind of felt that it was odd. So . . . I think I started reaching for the controls and [Baldwin] started to stop his transition." (Pls.' Farr Dep. 126-27.) At this point, Farr took control of the Agusta and executed a quick stop, which is a rapid deceleration of the helicopter or a maneuver to stop the forward momentum of the aircraft. (Pls.' Baldwin Dep. 49, 67-68, 94; Pls.' Farr Dep. 206.)

The Agusta was approximately 2,678 feet away from the Grumman (Agusta Corp.'s Reply Ex. K; July 23 Hr'g Tr. 40-41), and traveling at a speed of 5 to 7 knots when the Grumman received ATC's instruction to "make right traffic" (Gov't's Farr Dep. 227-28, Gov't's Mot. Ex. H). After Farr executed the quick stop, the Agusta slowed to a "minimal creep." (*Id*. at 228.) When the Grumman departed from controlled flight, the Agusta was at the most conservative estimate, 2,627 feet away. (Gov't's Sommer Dep. 128-29, Gov't's Mot. Ex. K.) During this time, the distance between the Agusta and the Grumman decreased by 51 feet. (Agusta Corp.'s Reply 10 n.7 & Ex. K.)

Almost immediately after the Grumman began its turn, the plane stalled and crashed into a nearby parking lot. (Pls.' Resp. to Gov't 45 n.32; Farr Accident Report 1; Richburg Dep. 236.) Both Angelina and Braddock were killed in the crash.

## II.    LEGAL STANDARD

A party is entitled to summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) ("Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted."). Where the nonmoving party bears the burden of proof at trial, the moving party may identify an absence of a genuine issue of material fact by showing the court that there is no evidence in the record supporting the nonmoving party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 325 (1986); *UPMC Health Sys. v. Metro. Life Ins. Co.*, 391 F.3d 497, 502 (3d Cir. 2004). If the moving party carries this initial burden, the nonmoving party must set forth specific facts showing that there is a genuine issue for trial. *See* Fed. R. Civ.

8

P. 56(c)(1) ("A party asserting that a fact is genuinely . . . disputed must support the assertion by . . . citing to particular parts of materials in the record."); *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (noting that the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts"). "Where the record taken as a whole could not lead a reasonable trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" *Id.* at 587 (citations omitted). When deciding a motion for summary judgment, courts must view facts and inferences in the light most favorable to the nonmoving party. *Anderson*, 477 U.S. at 255. Courts must not resolve factual disputes or make credibility determinations. *Siegel v. Transfer, Inc. v. Carrier Express, Inc.*, 54 F.3d 1125, 1127 (3d Cir. 1995).

## III. DISCUSSION

Plaintiffs bring claims of negligence against the Government and Agusta Corp. pursuant to the Federal Tort Claims Act, 28 U.S.C. §§ 1346(b) and 2671, *et seq.*, a claim for spoliation of evidence against the Government, and a claim for breach of contract against Agusta Corp. Section 1346(b) of the Federal Torts Claims Act provides that the Government shall be liable for personal injury, death, or property damage caused by the negligent or wrongful act or omission of a Government employee in accordance with the law of the place where the act or omission occurred. This accident occurred in Pennsylvania. Therefore, the law of the Commonwealth of Pennsylvania governs.

### A. Negligence Claims

Under Pennsylvania law, the general rules of negligence apply to negligence actions involving plane crashes. *Remo v. United States*, 852 F. Supp. 357, 365 (E.D. Pa. 1994); *Himmler v. United States*, 474 F. Supp. 914, 929 (E.D. Pa. 1979). To prevail on a negligence claim,

Plaintiffs must establish the following elements: (1) a legally recognized duty that requires that Defendants conform to certain standards of conduct; (2) a breach of that duty evidenced by a failure to conform to the standards required; (3) a causal connection between the conduct and the resulting injury; and (4) damage resulting to the interests of another. *Morena v. South Hills Health Sys.*, 462 A.2d 680, 684 n.5 (Pa. 1983); *Markovich v. Bell Helicopter Textron, Inc.*, 805 F. Supp. 1231, 1236 (E.D. Pa. 1992). Plaintiffs must establish that Defendants' conduct was both the cause in fact (physical cause) and proximate (legal) cause of the injury. *Galullo v. Fed. Exp. Corp.*, 937 F. Supp. 392, 394 (E.D. Pa. 1996). Cause in fact involves "'a *de minimis* standard of causation, under which even the most remote and insignificant force may be considered the cause of an occurrence.'" *Herman v. Welland Chem., Ltd.*, 580 F. Supp. 823, 827 (M.D. Pa. 1984) (quoting *Takach v. B.M. Root Co.*, 420 A.2d 1084, 1086 (Pa. Super. Ct. 1980)). Proximate cause involves a determination that the nexus between a defendant's wrongful acts or omissions and the injury sustained by the plaintiff is such that society would want to hold the defendant liable for their conduct. *Galullo*, 937 F. Supp. at 395. Plaintiffs must prove each of these elements by the fair weight or preponderance of the evidence. *Hamil v. Bashline*, 392 A.2d 1280, 1284 (Pa. 1978).

While the "nature and extent of the duty of due care is a question of law," *United States v. Redhead*, 686 F.2d 178, 182 (3d Cir. 1982), if there is a finding of a breach of a duty of care and a causal connection between the breach and the injury, "both the degree of negligence in performing those duties and the extent to which the negligent performance of those duties causes the accident are questions of fact," *Rodriquez v. United States*, 823 F.2d 735, 746 (3d Cir. 1987).

1.      *Legal Duties of Agusta and ATC*

Pilots and air traffic controllers have concurrent duties of care.  *Remo*, 852 F. Supp. at

365 (citing *Redhead*, 686 F.2d at 182).  The Third Circuit has explained these duties as follows:

> The pilot is in command of the aircraft, is directly responsible for its operation, and has final authority as to its operation.  He must be aware of those facts which are material to its proper operation and is charged with that which he should have known in the exercise of the highest degree of care.
> Tower personnel and air traffic controllers are often a source of vital information. If there is negligence on the part of such persons, it must have a causal relationship to the happening of the accident-in other words, their conduct must be a proximate cause.

*Redhead*, 686 F.2d at 182 (internal citations omitted).  These duties are derived from

FAA Regulations, publications of the FAA, and the common law.  *Turner v. United*

*States*, 736 F. Supp. 2d 980, 1000 (M.D.N.C. 2010).

(i)      Federal regulations

"The FAA has a statutory duty to promote safety in air transportation, not to insure it."

*United States v. S.A. Empresa de Viacao Aerea Rio Grandense (Varig Airlines)*, 467 U.S. 797,

821 (1984).  The FAA promotes air safety by promulgating Federal Aviation Regulations

("FARs"), which are codified in Title 14 of the Code of Federal Regulations.  The FARs

establish safety standards by regulating, among other things, pilot flight responsibilities and

flight rules.  *Abdullah v. Am. Airlines, Inc*., 181 F.3d 363, 369 n.6-9 (3d Cir. 1999).  Specifically,

14 C.F.R. § 91.13 requires that "[n]o person may operate an aircraft in a careless or reckless

manner so as to endanger the life or property of another."  14 C.F.R. § 91.13(a).  Similarly, 14

C.F.R. § 91.111 provides that "[n]o person may operate an aircraft so close to another aircraft as

to create a collision hazard."  14 C.F.R. § 91.111(a).  In addition, 14 C.F.R. § 91.113(b) provides

that "[w]hen weather conditions permit, regardless of whether an operation is conducted under

instrument flight rules or visual flight rules, vigilance shall be maintained by each person operating an aircraft so as to see and avoid other aircraft." 14 C.F.R. § 91.113(b).

(ii) <u>Aeronautical information manual and rotorcraft flying handbook</u>

The FARs also require pilots to be familiar with, and adhere to, the provisions of the Aeronautical Information Manual ("AIM"). *Turner*, 736 F. Supp. 2d at 1001. "The purpose of the AIM is to instruct pilots about basic flight information, air traffic control procedures, and general instructional information." *Id*. (internal quotation marks omitted). Section 4-3-17 of the AIM provides that "[i]nsofar as possible, helicopter operations will be instructed to avoid the flow of fixed-wing aircraft to minimize overall delays; however, there will be many situations where faster/larger helicopters may be integrated with fixed-wing aircraft for the benefit of all concerned." AIM § 4-3-17(a)(2).[6] Section 4-2-1 requires pilots "to maintain vigilance in monitoring air traffic control communications frequencies for potential traffic conflicts with their aircraft especially when operating on an active runway and/or when conducting a final approach to landing." AIM § 4-2-1(b).

The Rotorcraft Flying Handbook is an FAA publication that is designed to serve as a technical manual for applicants who are preparing for their helicopter pilot certificates.[7] With regard to traffic patterns, the manual provides that:

> A traffic pattern is useful to control the flow of traffic, particularly at airports without operating control towers. It affords a measure of safety, separation, protection, and administrative control over arriving, departing, and circling aircraft. Due to specialized operating characteristics, airplanes and helicopters do

---

[6] Excerpts from the AIM are attached as Exhibit 18 to Plaintiffs' Response to Agusta Corp. and as Exhibit O to Agusta Corp.'s Reply.

[7] Excerpts from the Rotorcraft Flying Handbook are attached as Exhibit 19 to Plaintiffs' Response to Agusta Corp. and as Exhibit L to Agusta Corp.'s Reply.

12

not mix well in the same traffic environment. At multiple-use airports, you routinely must avoid the flow of fixed-wing traffic. To do this, you need to be familiar with the patterns typically flown by airplanes. In addition, you should learn how to fly these patterns in case air traffic control (ATC) requests that you fly a fixed-wing traffic pattern.

Rotorcraft Handbook 9-18. The manual further states that "[w]hen a control tower is in operation, [pilots] can request the type of departure [they] desire. In most cases, helicopter departures are made into the wind unless obstacles or traffic dictate otherwise." *Id*. In addition, prior to takeoff, pilots should "ensure that the area is clear of other traffic. Then, head the helicopter into the wind, if possible." *Id*. at 9-5.

(iii)    Air traffic control manual

The FAA also promotes air safety by operating a nationwide ATC system. *See* 49 U.S.C. §§ 40101(d), 44701(a). As part of its operations, the FAA employs Controllers who provide services from ATC towers. The primary purpose of the ATC system, as set forth in the Air Traffic Control Manual ("ATCM"), Order JO 7110.65S, is to "prevent a collision between aircraft operating in the system and to organize and expedite the flow of traffic . . . ." ATCM § 2-1-1.[8] The duties of Controllers are set forth in the ATCM. *Remo*, 852 F. Supp. at 368 (citing *Rodriquez*, 823 F.2d at 740). In negligence cases, courts rely upon the ATCM to help determine the "contours of the state-law duty." *LeGrande v. United States*, 687 F.3d 800, 809 n.10 (7th Cir. 2012) (collecting cases). However, the duties of a Controller go beyond those that are imposed by the ATCM. *Himmler*, 474 F. Supp. at 931. Controllers also have a general duty to "exercise judgment to attempt to avoid danger where such danger was, or should have been,

---

[8] Excerpts from the ATCM are attached as Exhibit O to the Government's Motion, as Exhibit 7 to Plaintiffs' Response to the Government, and as Exhibit Q to Agusta Corp.'s Reply.

obviously imminent under the circumstances." *Id*. Controllers are held to an ordinary standard of care in carrying out their duties. *Remo*, 852 F. Supp. at 365.

The ATCM requires Controllers to be "familiar with the provisions of [the manual] that pertain to their operational responsibilities and to exercise their best judgment if they encounter situations that are not covered by it." ATCM § 1-1-1. In addition to their primary function of preventing collisions and organizing traffic flow, Controllers are required to "provide additional service procedures to the extent permitted by higher priority duties and other circumstances." *Id*. at § 2-1-1. In prioritizing their duties, the ATCM states that Controllers should first separate aircraft and issue safety alerts and then use good judgment "in prioritizing all other provisions of this order based on the requirements of the situation at hand." *Id*. at § 2-1-2(a).

When providing traffic information, Controllers are instructed to "[d]escribe vehicles, equipment, or personnel on or near the movement area in a manner which will assist pilots in recognizing them." *Id*. at § 3-1-6(a). In addition, Controllers are instructed to "[d]escribe the relative position of traffic . . . ." *Id*. at § 3-1-6(b). The ATCM also instructs local Controllers to "visually scan runways to the maximum extent possible," *id*. at § 3-1-12(a), and requires ground control to assist "in visually scanning runways, especially when runways are in close proximity to other movement areas," *id*. at § 3-1-12(b).

Controllers are also required to "[e]stablish the sequence of arriving and departing aircraft by requiring them to adjust flight or ground operation, as necessary, to achieve proper spacing." *Id*. at § 3-8-1. Specifically, with regard to helicopter departures, clearance for takeoff should be issued "from movement areas other than active runways, or in diverse directions from active runways, with additional instructions, as necessary." *Id*. at § 3-11-2. In addition,

14

"[u]nless requested by the pilot, [ATC should] not issue downwind takeoffs if the tailwind exceeds 5 knots." *Id*. at § 3-11-2d.

The ATCM further provides that Controllers may abbreviate transmissions by using "the identification prefix and the last 3 digits or letters of the aircraft identification after communications have been established." *Id*. at § 2-4-9. When identifying aircraft, Controllers should:

> State the prefix 'November' when establishing initial communications . . . followed by . . . the numbers/letters of the aircraft registration. The controller may state the aircraft type, the model, the manufacturer's name, followed by . . . the numbers/letters of the aircraft registration if used by the pilot on the initial or subsequent call.

*Id*. at § 2-4-20. According to Plaintiffs' ATC expert, Pete Burgess, the purpose of these two ATCM provisions "is to avoid confusion caused by just using only numbers and also to identify the type of aircraft for other traffic in the pattern or airport traffic area." (Burgess Decl. ¶ 9, Pls.' Resp. to Gov't Mot. Ex. 23.)

### 2. *Breach of Duty*

Plaintiffs claim that Defendants were negligent in breaching their duty to Plaintiffs' decedents in multiple ways. Plaintiffs maintain that the Agusta lacked a "single justifiable reason" for requesting a westerly departure (Pls.' Resp. to Agusta Corp. 6), and that ATC "lacked a legitimate reason" for granting the Agusta's request (Pls.' Resp. to Gov't 7-8). Plaintiffs argue that the westerly departure violated a Letter of Agreement ("LOA") between the Airport and Agusta Corp. (Pls.' Resp. to Gov't 8-9; Pls.' Resp. to Agusta Corp. 18-19.) Plaintiffs contend that Defendants had a duty to clarify precisely what was meant by a westerly departure. (Pls.' Resp. to Gov't 25-26; Pls.' Resp. to Agusta Corp. 25-26.) Finally, Plaintiffs argue that the Agusta breached its duty to avoid the flow of fixed-wing traffic (Pls.' Resp. to

15

Agusta Corp. 19-20), and that ATC failed to provide the Grumman with separation services and lost situational awareness (Pls.' Resp. to Gov't 40-41). Plaintiffs contend that the negligence of these Defendants caused this accident.

(i)     Justifiable and legitimate reason for a westerly departure

Contrary to Plaintiffs' assertions, there were legitimate and justifiable reasons for a westerly departure of the Agusta. Section 9-18 of the Rotorcraft Flying Handbook provides that when operating at an airport with an ATC tower, pilots are permitted to request the type of departure that they desire. In fact, the Handbook recognizes the fact that helicopter pilots will generally request departures into the wind, unless obstacles or traffic dictate otherwise. Furthermore, the ATCM explicitly instructs ATC not to issue downwind departures when wind speeds exceed five knots, unless specifically requested by the pilot.

Here, the Agusta was operating at an airport with an ATC tower. At the time of the Agusta's departure, the wind was traveling out of the northwest at 8 knots. Baldwin testified that he requested a westerly departure because taking off into the wind adds to the performance of the aircraft, and a downwind departure would have been "extremely poor airmanship." (Agusta Corp.'s Baldwin Dep. 130-31, 182-84.) Plaintiffs' helicopter expert, Vernon Albert, testified that "as far as wind direction [the Agusta's request] was probably appropriate." (Agusta Corp.'s Albert Dep. 58-59, Agusta Corp.'s Mot. Ex. 11.) Likewise, Plaintiffs' ATC expert, Pete Burgess, testified that the Agusta pilots did not do anything wrong "[i]nsofar as the clearance that they received and how they responded." (Agusta Corp.'s Burgess Dep. 8-9, Agusta Corp.'s Mot. Ex. 14.) We are compelled to conclude that the Agusta pilots were justified in requesting a westerly departure. Moreover, given the wind speed and direction, an eastern or southern departure would have subjected the Agusta to a tailwind in excess of 5 knots. Pursuant to the

ATCM, ATC had a legitimate reason for granting the Agusta's request. Agusta Corp. and ATC were not negligent in requesting and granting the westerly departure.

(ii)    <u>LOA</u>

Plaintiffs argue that the Agusta's westerly departure violated a LOA that was executed between the Airport and Agusta Corp. on August 15, 2008. (Pls.' Resp. to Agusta Corp. 6-7; Pls.' Resp. to Gov't 8.) The purpose of the LOA was to create standardized flight paths for helicopters that were taking off or landing from the east ("Echo") or south ("Sierra"). (Pls.' Resp. to Agusta Corp. 18; Pls.' Resp. to Gov't 8.) Although the LOA was not formally executed until three months after the date of the accident, Plaintiffs point to the fact that these flight paths were being utilized by other Agusta Corp. pilots prior to the date of the crash. (Pls.' Resp. to Agusta Corp. 6; Pls.' Resp. to Gov't 8.) Plaintiffs maintain that if Defendants had utilized these safer routes "the Agusta would not have been traveling anywhere near the departure end of an active runway and this crash would not have occurred." (Pls.' Resp. to Gov't 8; Pls.' Resp. to Agusta Corp. 7.)

As discussed in our memorandum denying the Government's motion to dismiss for lack of subject-matter jurisdiction, it is unclear how a negotiated, but unconsummated, agreement between the Airport and Agusta Corp. affects the legality of the Agusta's departure. *Turturro*, 2012 WL 1758154, at *6 n.4. Moreover, even if the Sierra and Echo routes were being used by other pilots prior to the date of the crash, they were not mandatory and did not apply to helicopters not traveling in those directions. (LOA, Agusta Corp.'s Reply Ex. A.) Agusta Corp. employee, Richard Burchnall, explained that the LOA was developed for Sierra Echo routing because Agusta Corp.'s primary production flight check areas are in New Jersey, and Agusta Corp. was generally looking to direct "a good portion" of these flights over unpopulated areas of

17

that state.  (Burchnall Dep. 109, 119, Pls.' Resp. to Agusta Corp. Ex. 6.)[9]  A westerly flight path

was not incorporated into the LOA because "there was no reason for [the Agusta pilots] to go out

west to do production flights."  (Burchnall Dep. 110.)  Instead, the LOA provides that

"[h]elicopters not requesting a specific [Echo or Sierra] Route will request and accept normal

sequencing from the [Airport] Tower for arrival and departure."  (LOA 4.)

In this case, the Agusta was not traveling to a destination that was in a southern or eastern

direction.  The Agusta was headed to Lancaster, Pennsylvania, which is to the west of the

Airport.  Pete Burgess testified that the Agusta did not necessarily have to request a Sierra or

Echo route because it was not headed in either of those directions.  (Agusta Corp.'s Burgess Dep.

113-14, 117.)  Instead, the pilots requested a westerly departure, in accordance with the terms of

the LOA, and received clearance from ATC.  Therefore, even if the LOA had been in effect at

the time of the accident, Agusta Corp. and ATC were not negligent.  They acted in compliance

with the LOA's provisions.

(iii)   <u>Clarification of westerly departure</u>

Plaintiffs maintain that because there was uncertainty between ATC and the Agusta as to

what a westerly departure meant, a number of things should have happened.  First, ATC should

have requested the Agusta to clarify its intentions to remove any doubt.  (Pls.' Resp. to Gov't.

25.)  Second, even if ATC and the Agusta were clear about what a westerly departure meant,

ATC should have requested the Agusta to state on frequency, for the benefit of the Grumman,

that its intention was to depart behind the Grumman.  (*Id*. at 26.)  Third, ATC should have

provided traffic information to the Grumman about the location and intentions of the Agusta.

---

[9] Burchnall further testified that training flights headed to airfields in Toms River, Red
Lion, and South Jersey could also use the Echo and Sierra routes.  (Burchnall Dep. 119.)

(*Id.*)  Finally, Plaintiffs contend that even if ATC did not ask for clarification, the Agusta pilots had an independent duty to make its intentions known to ATC and the Grumman.  (Pls.' Resp. to Agusta Corp. 25-26, 30.)

We reject Plaintiffs' assertion that the Agusta pilots breached a duty to the Grumman pilots by failing to clarify their departure intentions.  There was no confusion between the Agusta and ATC.  Richburg understood the Agusta's request for a westerly departure to mean that the Agusta would be headed in the general direction of the west.  As Plaintiffs' expert Burgess, testified, once the clearance request was granted, the Agusta was permitted to take off in any direction westerly.  (Agusta Corp.'s Burgess Dep. 9-10.)[10]  Moreover, to the extent that the Agusta pilots had a duty to clarify their intentions, they satisfied this duty by announcing over a common frequency that they had the Grumman in sight.  *See* AIM § 5-5-12 ("Acceptance of instructions to follow another aircraft or to provide visual separation from it is an acknowledgment that the pilot will maneuver the aircraft as necessary to avoid the other aircraft or to maintain in-trail separation.").

With regard to the question of whether Richburg breached a duty to the Grumman pilots by granting the Agusta's departure request, Plaintiffs contend that Richburg "gave the airport away" by clearing the Agusta "on course."  (Pls.' Resp. to Gov't 28.)  According to Plaintiffs, Richburg should have denied the Agusta's request, and should have instead cleared it to the east or south.  (*Id*. at 27-28.)  Alternatively, Plaintiffs contend that Richburg should have delayed the

---

[10] Plaintiffs also claim that by taking off in a northwesterly direction the Agusta pilots violated section 4-3-5 of the AIM, entitled "Unexpected Maneuvers in the Airport Traffic Pattern."  This section provides that pilots in a landing sequence should always advise the controller prior to making a major maneuver such as a 360 degree turn.  AIM § 4-3-5.  The Agusta's decision to depart to the northwest rather than to the west was not such a maneuver.

Agusta's departure until Runway 33 was safely clear of touch and go traffic. (*Id.* at 27.) At a minimum, Plaintiffs contend that Richburg breached her duty to provide the Grumman with traffic information. There are several problems with these arguments.

Joseph Gramlich, counter-claim Defendant Turturro's ATC expert, testified that there was nothing wrong with clearing the Agusta for a westerly departure, and that it would not have been a good control plan to delay the Agusta, because a conflict would have then existed for the next arriving aircraft. (Gramlich Dep. 120, 121, Agusta Corp.'s Mot. Ex. 19.) Furthermore, as explained above, clearance to the east or south would have been inappropriate given the direction and speed of the wind. Finally, although section 3-1-6 of the ATCM requires ATC to provide pilots with information about traffic near the movement area, the Agusta was "nowhere near the runway at the time" and that there was "no way [it] would be a factor for the Grumman . . . ." (Richburg Dep. 199-200, 203.) Moreover, Richburg did not grant the Agusta's clearance request until the Agusta acknowledged that it had the Grumman in sight. (*Id.* at 199, 330.) This acknowledgement was made over a common frequency that the Grumman pilots should have heard. (Cianfrani Dep. 288-289, Agusta Corp.'s Reply Ex. T; Agusta Corp.'s Albert Dep. 121.) Therefore, the Grumman pilots should have known that the Agusta pilots intended to take the steps necessary to maintain proper separation.

(iv)     The Agusta's avoidance of fixed wing traffic

Plaintiffs next claim that the Agusta pilots breached their duty to avoid the flow of fixed-wing traffic as set forth in the FARs, AIM, and Rotorcraft Flying Handbook. (Pls.' Resp. to Agusta Corp. 16.) Again, we disagree. With regard to the FARs, Plaintiffs' expert, John Suchocki, a retired airline captain with over 17,000 hours of flying experience (Pls.' Resp. to Agusta 26), testified that the Agusta pilots did not do anything wrong on the day of the accident,

20

and that they complied with their responsibilities (Suchocki Dep. 216, Agusta Corp.'s Mot. Ex. 17).  Plaintiffs' expert, Vernon Albert, testified that there is no FAR that instructs helicopter pilots to avoid fixed-wing traffic.  (Agusta Corp.'s Albert Dep. 108-109.)[11]

Having failed to identify a relevant FAR, Plaintiffs rely upon section 4-3-17 of the AIM. Although this provision instructs helicopter pilots to avoid the flow of fixed-wing traffic, its purpose is to minimize overall delays, not to prevent collisions.  In fact, section 4-3-17 explicitly states that there are many situations in which helicopters will be integrated with fixed-wing traffic.  Here, Plaintiffs do not assert that the actions of the Agusta pilots resulted in any delay. Their reliance on this section of the AIM is misplaced.  Finally, Plaintiffs cite section 9-18 of the Rotorcraft Flying Handbook, and argue that a pilot's "desire to depart into the wind must always yield if traffic dictates otherwise."  (Pls.' Resp. to Agusta Corp. 21.)  As will be discussed in greater detail below, this argument fails because the Agusta pilots did in fact yield to the Grumman.

Plaintiffs have offered no evidence to support their claim that the Agusta pilots violated the duties set forth in the FARs, AIM, or Rotorcraft Flying Handbook.  Furthermore, Plaintiffs' contentions are generally inconsistent with the testimony of the experts in this case.  Pete Burgess testified that he was not critical of the Agusta pilots (Agusta Corp.'s Burgess Dep. 23), and Joseph Gramlich testified that from the perspective of ATC, the Agusta pilots did not do

---

[11] Agusta Corp. notes that it have only been able to identify one FAR which states that helicopters must avoid the flow of fixed-wing traffic.  That regulation states that "[w]hen approaching to land at an airport without an operating control tower in Class G airspace . . . [e]ach pilot of a helicopter or a powered parachute must avoid the flow of fixed-wing aircraft." 14 C.F.R. § 91.126(b)(2).  Class G airspace is uncontrolled airspace.  (Pilot's Handbook of Aeronautical Knowledge 14-3, Agusta Corp.'s Reply Ex. P.)  Here, it is undisputed that the Agusta was departing and that both aircraft were operating in controlled airspace.

anything wrong (Gramlich Dep. 130). Similarly, Plaintiffs' accident reconstruction expert, Douglas Stimpson, testified that he could not "fault the [Agusta] pilots for complying with ATC commands." (Agusta Corp.'s Stimpson Dep. 18, Agusta Corp.'s Mot. Ex. 16.) We are compelled to conclude that the Agusta pilots did not violate their duty to avoid the flow of fixed wing traffic.

(v)     <u>Collision hazard</u>

In a related claim, Plaintiffs argue that the Agusta pilots operated their helicopter "so close to another aircraft as to create a collision hazard," in violation of 14 C.F.R. § 91.111(a), and "in a careless or reckless manner so as to endanger the life or property of another," in violation of 14 C.F.R. § 91.13(a). (Pls.' Resp. to Agusta Corp. 21-22.) Plaintiffs base this argument on the assertion that the Agusta, which was traveling at speeds in excess of the Grumman, barged into the Grumman's flight path. (*Id*. at 6, 22.) In addition, Plaintiffs contend that the Agusta violated its duty to monitor radio traffic, in violation of section 4-2-1 of the AIM, by failing to hear the "make right traffic instruction." (*Id*. at 28.) Plaintiffs maintain that if the Agusta pilots had heard this instruction they would not have lost situational awareness and would not have continued moving forward in the direction of the Grumman. (*Id*. at 28-29.)

The record does not support Plaintiffs' claim that the Agusta pilots created a collision hazard with the Grumman. In fact, it is uncontested that the Agusta pilots saw and avoided the Grumman at all times in accordance with 14 C.F.R. § 91.113(b). (Agusta Corp.'s Sommer Dep. 142, Agusta Corp.'s Mot. Ex. 13; Agusta Corp.'s Burgess Dep. 329; Agusta Corp.'s Albert Dep. 49.) Moreover, Douglas Stimpson testified that he would not even apply that provision because he did not "think that any of the aircraft . . . were conflicted to the point of any violation of that regulation." (Agusta Corp.'s Stimpson Dep. 21.) Stimpson further testified that any potential

22

collision hazard between the two aircraft was perceived rather than actual. (*Id*. at 19.) Likewise, Plaintiffs' other accident reconstruction expert, Donald Sommer, testified that "if the Agusta stops, there is no collision hazard with the Grumman." (Agusta Corp.'s Sommer Dep. 156.) Finally, Vernon Albert testified that only the Agusta pilots were in a position to know whether the actions they took prevented a collision from happening. (Agusta Corp.'s Albert Dep. 125.)

Farr provided a definitive answer to this question when he testified that "[w]e were in no collision hazard, nor was [the Grumman] a collision hazard to us." (Gov't's Farr Dep. 207.) In addition to being pointed behind the Grumman, the Agusta was a half-mile away from the Grumman when the Grumman commenced its right-hand turn. (*Id*.) Also, Plaintiffs' contention that the Agusta barged into the path of the Grumman misstates the testimony of Vernon Albert. Although Albert testified that the Agusta was capable of traveling at speeds in excess of the Grumman, he explicitly stated that he had no basis upon which to estimate the Agusta's actual speed. (Agusta Corp.'s Albert Dep. 60.) On that issue, both Albert and Sommer deferred to the testimony of the Agusta pilots. (*Id*.; Agusta Corp.'s Sommer Dep. 54-55.)

The Agusta pilots provided an answer to that question as well. Farr testified that during takeoff, the Agusta accelerated to a speed of only 5 to 7 knots before returning to a minimal creep. Baldwin corroborated this statement by testifying that "it took only a couple of seconds" for the Agusta to return to a hover "because our airspeed was so low already." (Agusta Corp.'s Baldwin Dep. 95-96.) This testimony is supported by the calculations provided by Donald Sommer. According to Sommer, the distance between the Agusta and the Grumman decreased by only 51 feet during the 8 seconds when the "make right traffic" instruction was given and when the Grumman departed from controlled flight. This equates to an average speed of only 4 or 5 miles an hour. (Agusta Corp.'s Reply at 10 n.7; July 23 Hr'g Tr. 41.) Moreover, it is

undisputed that the Agusta executed a quick stop within seconds of observing the Grumman's right-hand turn. These facts simply do not support Plaintiffs' claim that the Agusta pilots operated their helicopter in a careless or reckless manner.

We also disagree with the contention that the Agusta pilots breached their duty to monitor radio communications. Plaintiffs' argument relies heavily upon the testimony of Vernon Albert. Albert testified that although there are circumstances in which a pilot can miss a call and still be situationally aware, this was not such a circumstance. (Agusta Corp.'s Albert Dep. 72.) Albert explained that if the Agusta pilots had heard ATC's instruction, they would not have been "startled into [] having to take evasive action" when the Grumman began its turn. (*Id.*)

The record does not support a finding that the Agusta was startled into taking evasive action. Farr explained his reasons for stopping the Agusta's forward momentum as follows:

> It's professional airmanship that if I can control my – we all are challenged to control our aircraft in relation to other aircraft, other buildings, other atmospheric conditions. So when he did something that we were not expecting him to do, the prudent and logical thing for me to do is just to minimize the situation by stopping my motion.

(Gov't's Farr Dep. 207.) This explanation is entirely consistent with Vernon Albert's testimony that although 1,000 feet is a good estimate of when it is necessary to slow down or take evasive action, "it's not an emergency." (Agusta Corp.'s Albert Dep. 42.) Here, the Agusta was over 2,600 feet away from the Grumman when it reduced its speed to a minimal creep within seconds of observing the Grumman's unexpected maneuver. The actions of the Agusta pilots demonstrate that they maintained situational awareness regardless of whether they heard ATC's instruction to "make right traffic." For this reason, as well as those expressed above, Plaintiffs have failed to prove that the Agusta pilots were negligent in breaching duties owed to Plaintiffs' decedents. Accordingly, summary judgment is appropriate.

Plaintiffs argue that ATC breached its duty to separate the Grumman from the Agusta when it instructed the Grumman to "make right traffic."  (Pls.' Resp. to Gov't 7.)  Specifically, Plaintiffs contend that Richburg's traffic instruction created a sense of urgency in the minds of the Grumman pilots because it was made during a "critical phase of flight" and was issued without the qualifier "speed and altitude permitting." [12]  Plaintiffs argue that as a result, the Grumman turned immediately and was startled by the potential collision hazard of the Agusta.

Plaintiffs are unable to cite to any publication in which the phrase "critical stage of flight" is defined.  (*See* Pls.' Resp. to Gov't 30-32.)  Instead, Plaintiffs rely upon the testimony of their expert witnesses, who define this stage of flight as the time just after lift-off when it is most difficult for pilots to take instructions and an aircraft is most prone to danger.  (*Id*.)  Even if we accept this definition, Plaintiffs have not provided this Court with any authority that prohibits Controllers from communicating with pilots during this time.  In contrast, it is undisputed that Controllers have the authority to change traffic patterns, "as necessary, to achieve proper spacing."  ATCM § 3-8-1.  In fact, four minutes prior to issuing her instruction to the Grumman, Richburg instructed the 76 Mike to "make right traffic."

Furthermore, there is disagreement as to what the phrase "speed and altitude permitting" means.  Richburg testified that the term means that when a pilot "gets to an altitude and the speed that he's operating his aircraft, he can turn whenever he wants."  (Richburg Dep. 183.)  Members of ATC testified that the phrase notifies pilots that they can use their discretion in

---

[12] It is unclear whether Richburg instructed the Grumman to make right traffic in order to accommodate the departing Agusta, as she indicated in her post accident statement, or whether she issued the instruction so that the Grumman would be in the same downwind pattern as 76 Mike (*see supra* note 5), as she testified in her deposition (Richburg Dep. 217-19).

determining when it is safe to execute a turn. (Singley Dep. 30-31, Pls.' Resp. to Gov't Ex. 33; Allen Dep. 123, Pls. Resp. to Gov't. Ex. 32.) However, these interpretations are inconsistent with the testimony of Hebert Hortman, the owner of the flight school. Hortman testified that in accordance with the Airport's traffic pattern, pilots are instructed to climb straight ahead to 500 feet before turning. (H. Hortman Dep. 34-35.) If a Controller wants a pilot to turn earlier "the proper way of saying it would be to turn speed and altitude permitting." (*Id*. at 35.) In other words, Controllers include the term when they want a pilot to turn as soon as it is practical to do so. (*Id*. at 36.)

Regardless of the resolution of the disagreement, it is evident that Richburg's instruction was not accompanied by any modifying language that suggested urgency. *See* ATCM § 2-1-5 ("Use the word 'immediately' only when expeditious compliance is required to avoid an imminent situation."). Moreover, Plaintiffs have cited no authority in support of their contention that the absence of such cautionary language can create a sense of urgency. Most importantly, as explained above, Plaintiffs cannot establish that Richburg's traffic instructions created an actual collision hazard. For these reasons, Plaintiffs cannot demonstrate that ATC breached its duty to separate the Grumman from the Agusta.

Plaintiffs also claim that ATC failed to properly separate the Grumman from the Exec Jet that departed from Runway 24. (Pls.' Resp. to Gov't 50-51.) This argument is based upon Pete Burgess's opinion that ATC was required to wait three minutes after the Exec Jet's departure before clearing the Grumman for takeoff. In support of this opinion, Burgess cites section 3-9-7 of the ATCM, entitled Wake Turbulence Separation for Intersection Departures.[13] However, the

---

[13] An intersection departure differs from a full length departure. On a full length departure an airplane begins its takeoff roll from the base of the runway. On an intersection

plain language of section 3-9-7 states that it only applies to aircraft that are departing on the same runway or parallel runways. ATCM § 3-9-7.

In this case, the Grumman and the Exec Jet were departing from intersecting runways. Therefore, section 3-9-8 of the ATCM, entitled Intersecting Runway Separation, applies. According to section 3-9-8, ATC is required to wait two minutes before clearing an aircraft for departure if the preceding aircraft was a heavy jet or B757. ATCM § 3-9-8(b)(3). Otherwise, ATC is permitted to clear the succeeding aircraft as soon as the "preceding aircraft has departed and passed the intersection . . . ." *Id.* at § 3-9-8(b)(1). Here, it is undisputed that the Exec Jet was not a heavy jet. Therefore, ATC was not negligent in clearing the Grumman for takeoff two minutes and thirty seconds after the Exec Jet passed through the intersection of Runways 24 and 33.

### (vii)    ATC's situational awareness

Plaintiffs claim that Richburg lost control of the traffic picture within the first minute of taking control of the position. (Pls.' Resp. to Gov't. 18.) Specifically, Plaintiffs contend that Richburg failed to identify the prefix of aircraft in the touch and go pattern and aircraft that was in-bound for landing on Runway 33, failed to advise the Grumman of the type of aircraft departing in front of it, issued instructions to the Grumman that were intended for another aircraft in the traffic pattern, and incorrectly identified aircraft. (*Id.* at 20-21.) The Government does not specifically address these allegations. Instead, the Government argues that regardless of Plaintiffs' complaints, "the FAA did not stall the airplane and did not cause the pilots to fail to recover from the stall." (Gov't's Reply 1, 10.) To the extent that Plaintiffs' allegations may

---

departure, an airplane begins its takeoff roll from somewhere further up than the base of the runway. (July 23 Hr'g Tr. 27); *see also New Hampshire Ins. Co. v. United States*, 641 F. Supp. 642, 648 (D.P.R. 1986).

constitute a breach of duty, we will address whether that breach was a proximate cause of this accident.

### 3. Causation

If there is negligence on the part of ATC, "it must have a causal relationship to the happening of the accident—in other words, their conduct must be a proximate cause." *Redhead*, 686 F.2d 182. "Pennsylvania courts have adopted the 'substantial factor' theory of proximate cause from the Restatement (Second) of Torts § 431 (1965)." *Chetty Holdings Inc. v. NorthMarq Capital, LLC*, 556 F. App'x 118, 121-22 (3d Cir. 2014). "Pennsylvania has also adopted the Restatement's definition of 'substantial factor." *Id*. The Restatement provides that the following factors are important in determining whether the defendant's conduct is a substantial factor in causing the harm:

> (a) the number of other factors which contribute in producing the harm and the extent of the effect which they have in producing it; (b) whether the actor's conduct has created a force or series of forces which are in continuous and active operation up to the time of the harm, or has created a situation harmless unless acted upon by other forces for which the actor is not responsible; (c) lapse of time.

Restatement (Second) of Torts § 433.

Although the question of proximate causation is generally left for the jury, "if the relevant facts are not in dispute and the remoteness of the causal connection between the defendant's negligence and the plaintiff's injury clearly appears, the question becomes one of law." *Liney v. Chestnut Motors, Inc*., 218 A.2d 336, 338 (Pa. 1966); *Holman v. Cent. Parking Sys*., No. 11-03, 2011 WL 1517958 (Pa. Ct. C.P. Mar. 21, 2011). Although speculation and conjecture are insufficient to defeat a motion for summary judgment, *Acumed LLC v. Advanced Surgical Servs*., 561 F.3d 199, 228 (3d Cir. 2009), proximate cause can be proven by circumstantial evidence, *Harvilla v. Delcamp*, 521 A.2d 763, 764 (Pa. 1989).

Many of the facts in this case are undisputed.  The parties agree that the Grumman did not suffer from any structural or mechanical defects and that it departed from controlled flight as the result of a stall.  (Pls.' Resp. to Gov't 45 n.32.)  Therefore, the only question to be answered is what caused the stall.  Defendants have at all times maintained that the pilots of the Grumman were solely responsible for the slow speed and low altitude of the aircraft, which resulted in its stall.  (Gov't Mot. 16, 18-19.)  Throughout the course of this litigation, Plaintiffs have advanced a number of theories.

(i)     Wake turbulence theory

A primary contention advanced in Plaintiffs' Form 95s was that the Grumman crashed as a result of wake turbulence generated by the departing Agusta.  *See Turturro*, 2012 WL 1758154, at *5.  Wake turbulence, as the Government explained at oral argument, comprises wingtip vortices, jet blast, and rotor downwash.  (July 23 Hr'g Tr. 12)  Wingtip vortices, which trail behind a helicopter, are created by a helicopter as it moves through the air.  (*Id.* at 13.)  In the early stages of this litigation, Plaintiffs maintained that the Agusta had either crossed over, or operated in the vicinity of, the departure end of Runway 33.  Based upon this mistaken premise, Plaintiffs argued that on departure, the Grumman flew through the Agusta's wake turbulence and crashed as a result.  *Turturro*, 2012 WL 1758154, at *4.  Plaintiffs have since acknowledged that this theory of causation was based upon an incorrect interpretation of the radar data from the time of the accident, and the wake turbulence theory is no longer being advanced.  (July 23 Hr'g Tr. 13-15, 47, 51.)

(ii)     Rotor downwash theory

In their Second Amended Complaint, Plaintiffs allege that the Agusta hovered "at, near, or in vicinity of the Gulf/Juliet Taxiway for a sufficient and/or extended period of time so as to

allow for the creation of an equidistant 360 degree rotor downwash pattern . . . ." (Sec. Am. Compl. ¶ 20.) Rotor downwash is created by a hovering or stationary helicopter and circulates outward, upward, around and away from the main rotors in all directions. (*Id*. at 19.) Plaintiffs argued in their responses to the Government's motion to dismiss for lack of subject-matter jurisdiction, that turbulence from the Agusta could have contributed to the Grumman's crash even if the Agusta did not hover over the departure end of Runway 33. (ECF Nos. 43, 44.)

Plaintiffs' rotor downwash theory is not supported by the record. As Plaintiffs' expert Dr. Carlos Diaz testified, "rotor wash usually extends out three rotor diameters from the helicopter, and the Grumman was not within three rotor diameters of the helicopter and would not have been affected by the rotor downwash." (Gov't Diaz Dep. 111, Gov't Reply Ex. T.) Similarly, Donald Sommer testified that:

> The only role rotor downwash could have played . . . is the general confusion of the air around the airport. The Agusta helicopter, as you point out so well, was quite a distance from the Grumman, so I think it is unlikely that there was a direct impingement of rotor downwash on the accident aircraft.

(Gov't Sommer Dep. 65.) Plaintiffs have also abandoned the rotor downwash theory of causation. (July 23 Hr'g Tr. 47.)

### (iii)    Exec Jet turbulence theory

In their Second Amended Complaint Plaintiffs also allege that the Exec Jet's departure from Runway 24 created "dangerous and hazardous wake turbulence or vortices for the [Grumman] as it crossed the departure end of Runway 33." (Sec. Am. Comp. ¶ 22.) However, as explained above, ATC complied with the separation requirements imposed by section 3-9-8 of the ATCM. Furthermore, Douglas Stimpson, who initially reported that the Grumman encountered turbulence, has since clarified that any turbulence experienced by the Grumman was

"normal turbulence" that pilots fly through every day.  (Gov't's Stimpson Dep. 74-75, Gov't's

Mot. Ex. N.)  Stimpson further testified that he doesn't "believe that the turbulence was what

actually upset the aircraft."  (*Id.* at 71.)  Plaintiffs did not address this theory at oral argument

and it appears as though it is no longer being advanced.  (July 23 Hr'g Tr. 47.)

(iv)    <u>Startle reaction theory</u>

Having abandoned their wake turbulence, rotor downwash, and general turbulence

theories, Plaintiffs now contend that the Grumman crash resulted from a "startle reaction."  (Pls.'

Resp. to Gov't 44.)  Specifically, Plaintiffs maintain that because neither of the Grumman pilots

would have knowingly or volitionally stalled the aircraft, the only possible explanation is that the

Grumman immediately complied with Richburg's instruction to "make right traffic" and was

"startled by the presence of a large Agusta helicopter in forward flight and accelerating towards

them as a potential collision hazard."  (*Id.* at 7, 44.)  Plaintiffs now contend that this startle effect

resulted in a sudden control input by the Grumman pilots which caused the aircraft to stall and

crash.  (*Id.* at 44.)

Plaintiffs' startle response theory is based upon the report and testimony of Dr. Carlos

Diaz.  Dr. Diaz testified that as the Grumman turned, the Agusta unexpectedly entered its field of

vision.  (Pls.' Diaz Dep. 31, 40-41, Pls.' Resp. to Gov't Ex. 37.)  According to Dr. Diaz, this was

sufficient to cause the pilot of the Grumman to momentarily feel that he was on a collision

course with the Agusta.  (*Id.*)  Dr. Diaz testified that when dealing with a startle reaction, "it

doesn't matter how close or how far a perceived threat is, as long as it is a perceived threat."

(*Id.* at 31-32.)  Dr. Diaz expanded that "you can't really accuse a pilot of being unreasonable

because he was startled by a stimulus that in your opinion was too far away to be a threat to him.

You have to make this distinction between what we reason and think about and what the body responds with a brain stem reflex to." (*Id*. at 35.)

In support of their "startle theory" of causation, Plaintiffs draw the Court's attention to the cases of *Marks v. Mobil Oil Corp*., 562 F. Supp. 759 (E.D. Pa 1983) and *McNabb v. Graham Gulf, Inc*., No. 03-2904, 2005 WL 1038024 (E.D. La. Apr. 27, 2005).[14] In *Marks*, the plaintiff alleged that a truck driver caused a car accident in which the plaintiff's son was injured. 562 F. Supp. at 762. The plaintiff's theory of causation was that the defendant's truck had created an air current as it passed the car in which the plaintiff's son was a passenger. *Id*. at 764. The plaintiff's expert opined that in an effort to counteract this air current, the car's driver consciously or subconsciously turned the steering wheel. *Id*. at 764-65. As a result, when the air current passed, the car veered into the defendant's truck. The car's driver testified that although she did not recall actually turning the wheel, she was aware of a strong force pushing the vehicle as the truck passed. *Id*. at 765. Despite the defendant's objection to this expert's testimony, the court found that the question of whether an individual's response to a startling event is a proximate cause of his injury is a question of fact to be decided by the jury. *Id*. at 765-66.

In *McNabb*, the plaintiff was a boat captain who claimed that he was thrown into the air when he stepped on a loose shaft guard covering an engine shaft. *McNabb*, 2005 WL 1038024 at *1. The defendant argued that it was physically impossible for the injury to have occurred in the manner that the plaintiff claimed. In support of his claim, the plaintiff sought to introduce the testimony of a "human factor expert" who would testify as to why the plaintiff misperceived the

---

[14] At oral argument, Plaintiffs were asked whether they were aware of any case law in which courts have specifically addressed the startle theory. (July 23 Hr'g Tr. 75-75.) Plaintiffs had no authority at that time, but subsequently submitted a joint motion for leave to file supplemental authority. (ECF No. 164.)

sequence of events that occurred during the accident.  *Id*. at *2.  However, in precluding the

expert's testimony, the court held that "the matter of one's response to sudden unanticipated

hazards is within the common understanding of the 'average juror.'"  *Id*. at *2.

Plaintiffs interpret these cases as standing for the proposition that the jury should

determine whether the Grumman stalled as the result of the pilot's startle reaction.  However,

there is a significant difference between the facts in *Marks* and *McNabb* and those presented

here.  In those cases, there was no question that the affected individuals actually perceived a

startling or unexpected event.  In the instant case, Plaintiffs' experts cannot testify with any

degree of reasonable certainty that the pilot of the Grumman saw the Agusta.  (Sommer Dep. 89,

Gov't's Reply Ex. W; Agusta Corp.'s Stimpson Dep. 212; Pls.' Burgess Dep. 145, Pls.' Resp. to

Gov't Ex. 24.)

Moreover, even if Plaintiffs were able to prove that the Grumman pilot saw the Agusta,

that fact alone is insufficient to establish liability.  Plaintiffs must also prove that as a result, the

pilot was startled.  In an effort to make such a showing, Plaintiffs assert that the Grumman pilots

were justified in viewing the Agusta as a perceived threat because that is how the Agusta pilots

viewed the Grumman.  (Pls.' Resp. to Gov't 45.)  Plaintiffs argue that Farr and Baldwin were

surprised by the Grumman's turn and believed that the two aircraft were close enough to warrant

evasive action.  (*Id*. at 49.)[15]  Plaintiffs misconstrue the testimony of the Agusta pilots.  Farr

---

[15]  In their Response to the Government's Motion, Plaintiffs argue that the distance
between the Grumman and the Agusta was far less than 2,627 feet.  This assertion is based upon
the opinion of Vernon Albert who testified that the two aircraft must have been closer together
because the Agusta pilots were able to "describe in detail the angles of bank and the angles . . .
the maneuvers that the Grumman was going through."  (Pls.' Resp. to Gov't 46; Pls.' Albert
Dep. 41-42, Pls.' Resp. to Agusta Corp. Ex. 35.)  However, Cameron Hortman, who testified that
he was much further away than the Agusta pilots, was also able to describe the Grumman's
movements in detail.  (Agusta Corp.'s C. Hortman Dep. 140, Agusta Corp.'s Reply Ex. U.)

testified that there was no collision hazard and that his decision to stop the forward momentum of the Agusta was a matter of professional airmanship. Moreover, although Farr and Baldwin were surprised by the Grumman's turn, they were surprised by the fact that the turn was being initiated at such an abnormally low altitude. As Baldwin stated, "a fixed-wing aircraft should not be—would not normally be making a right-hand turn at 200 feet above the ground, it was completely out of sequence as to what would normally happen with an aircraft in front of you taking off." (Agusta's Baldwin Dep. 94, 95.) The testimony provided by Farr and Baldwin demonstrates that they did not perceive the Grumman as a threat and were not startled by its presence.

Plaintiffs' startle theory of causation relies upon a number of assumptions which simply cannot be proven. Plaintiffs can do no more than speculate that the Grumman pilots interpreted Richburg's "make right traffic" instruction as an immediate, urgent directive. Moreover, Plaintiffs cannot reasonably demonstrate that the Grumman pilots actually saw the Agusta helicopter or that they were startled as a result of seeing it. Plaintiffs' startle theory is based on sheer speculation.

We contrast these assumptions with the undisputed fact that "[t]he pilot in command of an aircraft is directly responsible for, and is the final authority as to, the operation of the aircraft." 14 C.F.R. § 91.3(a); *see also Remo*, 852 F. Supp. at 369 (citing *Redhead*, 686 F.2d at 182). We further note that Controllers "are not required to foresee or anticipate the unlawful, negligent or grossly negligent acts of pilots." *Beech Aircraft Corp. v. United States*, 51 F.3d 834, 840 (9th Cir. 1995); *accord Schuler v. United States*, 868 F.2d 195, 198 (6th Cir. 1989); *Biles v.*

Furthermore, Albert's speculations contradict the accident reconstruction of Plaintiffs' expert Donald Sommer.

*United States*, 848 F.2d 661, 663 (5th Cir. 1988). For example, in the *Schuler* case, the Sixth

Circuit held that ATC did not breach its duty to keep the runway clear where the only potential

conflict was in the mind of the pilot. 868 F.2d at 197. In *Schuler*, the plane crashed because the

pilot "banked the plane in excess of the angle that would cause the plane to stall." *Id* at 198.

The Court found that the pilot was the sole cause of the crash because he should have known that

the bank was too steep given the circumstances. *Id.*; *see also In re Air Crash Disaster at Metro

Airport, Detroit, Mich. on Jan. 19, 1979*, 619 F. Supp. 13, 18 (E.D. Mich. 1984) (finding that

even if ATC breached its duty to provide separation services, the pilot was responsible for

reducing the airplane's speed to the point of a stall), *aff'd*, 919 F.2d 1079 (5th Cir. 1991).

 Plaintiffs do not contest the fact that the Grumman crashed as the result of a stall. A stall

occurs when an airplane flies too slowly and the airflow over the wing separates. *In re Air Crash

Disaster*, 619 F. Supp. at 15 n.3; *see also New Hampshire Ins. Co.*, 641 F. Supp. at 645-46. The

speed at which a stall will occur increases with an airplane's angle of bank. (H. Hortman Dep.

145; Pilot Operating Handbook, Gov't's Mot. Ex. I.) Specifically, the stall speed of the

Grumman increases from 56 knots to 67 knots when the aircraft banks 45 degrees. (Hr'g Tr. 10,

11; Pilot Operating Handbook.)

 In the instant case, a number of eyewitnesses testified as to the abnormally slow speed of

the Grumman as it climbed out of its touch and go. Donald Sommer attributed the slow speed to

the fact that the Grumman pilots were practicing a maneuver called a short field takeoff, which

involves an initial speed of 65 knots followed by acceleration to 77 knots.[16] (Sommer Dec. 5,

---

[16] We note that this is well below the preferred departure speed of 90 knots, and the minimum speed of 78 knots set forth in the Hortman Standardization Package. (Hortman Standardization Package, Gov't Mot. Ex. J.)

Pls.' Resp. to Agusta Ex. 22.)  At these speeds, the Grumman was operating with a minimal

margin of error.  In fact, the turn alone was sufficient to cause a stall.  As Cameron Hortman

testified, the Grumman is "not the most stable aircraft, and if you allow it to get to a slow enough

speed at a low enough altitude, unlike other aircraft that we have at Hortman, it will be hard to

recover from any stall."  (C. Hortman Dep. 17-18.)  As in *Schuler*, the Grumman pilots should

have been aware of these facts.  ATC is not responsible for the decision of the Grumman pilots

to initiate a turn at an abnormally low altitude at an unsafe speed.  This is not the first time that a

plane has crashed as a result of pilot error, and unfortunately it will not be the last.  A jury should

not be permitted to speculate or guess as to what happened here.

> **B.**     **Spoliation of Evidence, Obstruction of Justice, and**
> **Unconstitutional Violation of Due Process**

Plaintiffs also bring a claim against the Government for spoliation of evidence,

obstruction of justice, and unconstitutional violation of due process.  Plaintiffs allege that the

Government had a legal obligation to preserve radar data and/or other radar evidence and

engaged in misconduct with respect to the destruction and/or concealing of that evidence.  (Sec.

Am. Compl. ¶ 64.)  Plaintiffs seek either a judgment against the Government for compensatory

damages or that the Government be precluded from arguing or asserting that the radar data

available to Plaintiffs is deficient or lacking.  (*Id.*)  Defendants contend that Pennsylvania law

does not recognize a cause of action for spoliation of evidence.  (Gov't Mot. 19.)

Spoliation of evidence involves the "non-preservation or significant alteration of

evidence for pending or future litigation."  *Pyeritz v. Pennsylvania*, 32 A.3d 687, 692 (Pa. Super.

Ct. 2011).  Where a party to a suit is personally involved in and charged with the spoliation of

evidence, Pennsylvania law permits trial courts to exercise discretion and to impose a range of

sanctions against that party. *Id.* at 692. In *Pyeritz*, the Pennsylvania Supreme Court weighed the

five-factor test outlined in *R.W. v. Manzek*, 888 A.2d 740, 747 (Pa. 2005), for determining

whether to impose a duty in a cause of action for negligence and declined to do so. *Pyeritz*, 32

A.3d at 693-95. The court determined that there is no separate cause of action in Pennsylvania

for the spoliation of evidence. *Id.* at 695.

Nevertheless, trial courts may impose sanctions on a party who intentionally destroys

evidence, including barring all evidence related to that issue from being admitted by the

offending party at trial, providing the jury with a "spoliation inference," or even entering

judgment against the offending party. *Schmid v. Milwaukee Elec. Tool Corp.*, 13 F.3d 76, 79 (3d

Cir. 1994). Sanctions may be imposed by a district court depending on:

> (1) the degree of fault of the party who altered or destroyed the evidence; (2) the
> degree of prejudice suffered by the opposing party; and (3) whether there is a
> lesser sanction that will avoid substantial unfairness to the opposing party and,
> where the offending party is seriously at fault, will serve to deter such conduct by
> others in the future.

*Id.* at 78-79 (concluding that a jury instruction on the spoliation inference, which permits the jury

to presume that "the destroyed evidence would have been unfavorable to the position of the

offending party" was a more appropriate remedy than the exclusion of the plaintiff's expert's

report); *see also Howell v. Maytag*, 168 F.R.D. 502, 507-508 (M.D. Pa. 1996) (applying *Schmid*

factors to case where the plaintiffs permitted their home, an accident scene, to be destroyed prior

to the defendant's inspection and concluding that a jury instruction on the spoliation inference

was appropriate). However, "a court should resort to the drastic sanction of entering judgment

against a spoliating party only when 'no alternative remedy by way of a lesser, but equally

efficient sanction is available.'" *Travelers Prop. Cas. Co. of Am. v. Cooper Crouse-Hinds, LLC*,

No. 05-6399, 2007 WL 2571450, at *4 (E.D. Pa. Aug. 31, 2007) (quoting *Baliotis v. McNeil*, 870 F. Supp. 1285, 1289 (M.D. Pa. 1994)).

Plaintiffs contend that the Government is liable for spoliating evidence because the FAA failed to ensure the preservation of radar data after litigation became reasonably foreseeable. (Pls.' Resp. to Gov't 54; July 23 Hr'g Tr. 71.)  Specifically, Plaintiffs maintain that the Government was aware of its potential culpability the day after the accident and provided three ATCs involved in the accident with supplemental training for review of intersecting runway operations under the ATCM.  (Pls.' Resp. to Gov't 54-55.)  Plaintiffs also contend that statements by Richburg made in her official FAA statement reflect culpability on her part and suggest an inference that the FAA destroyed crucial radar evidence to prevent Plaintiffs from proving their claims.  (Pls.' Resp. to Gov't 54-55.)  Plaintiffs request judgment on the claim or, in the alternative, an adverse inference.  (*Id.* at 55.)

The Government responds that the destruction of the radar data was pursuant to standard FAA document retention policies.  (Gov't's Mot. 20.)  According to the Government, ATC at the Airport is a non-radar facility, so it had no radar data.  (Gov't's Reply 15.)  Radar data maintained at other facilities are preserved pursuant to FA Order 8020.16, Air Traffic Organization Aircraft Accident and Incident Notification, Investigation, and Reporting (Sept. 13, 2005).  (Order 8020.16, Gov't's Reply Ex. AA.)  The Order provides that an air traffic facility that "provided no direct or indirect air traffic services to the aircraft in question" must retain documentation such as radar data only "[w]hen requested by specific persons."  (*Id.* ¶ 72(b).)  If such data is not requested by specific persons, the FAA approach is that control facilities retain that data for forty-five days.  (Robert Cauble Dep. 8, Gov't's Mot. Ex. R.)

Robert Cauble, Plaintiffs' radar data expert, acknowledged that he was first retained in September of 2008 and sent Freedom of Information Act ("FOIA") requests on September 4, 2008 to the FAA and United States Air Force. (*Id.* at 7.) The accident occurred on May 22, 2008—105 days before Cauble's first request for data. In response to his FOIA request to the Air Force, Cauble received RADES data, which is preserved for one year. (*Id.* at 7-8.) Cauble did not request data from an Air Route Traffic Control Center, which typically retain radar data for forty-five days. (*Id.* at 8.) Cauble expected Philadelphia Approach Control, based out of Philadelphia International Airport, to have STARS data, despite the fact that the Grumman did not have any interaction with Philadelphia International Airport. (*Id.* at 9-10.) Moreover, Cauble testified that it was his understanding that Philadelphia International Air Traffic Control Tower placed its radar tape back into service in the normal course according to standard procedure. (*Id.* at 20.)

Clearly, Pennsylvania law does not provide a separate cause of action for the spoliation of evidence. Plaintiffs request sanctions based on the conduct of the United States. However, Plaintiffs have provided no evidence whatsoever that data was withheld or destroyed in bad faith. Rather, as Cauble indicated, months after the accident occurred, he put in FOIA requests to which the Government responded. Plaintiffs' failure to request the data that they sought in a timely fashion and from the appropriate facilities created this problem, not the Government's document retention policies, which were followed in an appropriate manner. Sanctions for the spoliation of evidence are not appropriate in this case.

**C.     Breach of Contract Claim Against Agusta Corp.**

Plaintiffs base their breach of contract claim on Agusta Corp.'s written lease with the City of Philadelphia for its use of the Northeast Philadelphia Airport. Plaintiffs maintain that as

a condition of the lease agreement, Agusta Corp. is required to comply with the standards of conduct set forth in the FARs. (Pls.' Resp. to Agusta Corp. at 39.) Plaintiffs further allege that Plaintiffs' decedents were third-party beneficiaries to the lease agreement because pilots and passengers are among the class of people that the FARs are intended to protect. (*Id*. at 39.) Agusta Corp. counters that because Plaintiffs' breach of contract claim is based upon the standards of care set forth in the FARs, it is redundant to their negligence claim and summary judgment is appropriate. (Agusta Corp.'s Reply 32.)

The question to be resolved is whether Plaintiffs' contractual claim survives under the gist of the action doctrine. This doctrine is applied by courts to maintain a conceptual distinction between breach of contract claims and tort claims. *Pediatrix Screening, Inc. v. Telechem Intern., Inc*., 602 F.3d 541, 548 (3d Cir. 2010). Generally, "the doctrine precludes plaintiffs from re-casting ordinary breach of contract claims into tort claims.'" *eToll, Inc. v. Elias/Savion Adver., Inc*., 811 A.2d 10, 14 (Pa. Super. Ct. 2002). However, "Pennsylvania courts have suggested that the doctrine can also bar contract claims where a defendant's wrongful conduct is the gist of the action," *Padalino v. Standard Fire Ins. Co*., 616 F. Supp. 2d 538, 550 (E.D. Pa. 2008) (citations omitted), and the contract is collateral, *Lebish v. Whitehall Manor, Inc*., 57 Pa. D. & C.4th 247, 250-51 (Pa. Ct. C.P. 2002); *see also Craig v. Amateur Softball Ass'n*, 951 A.2d 372, 377 (Pa. Super. Ct. 2008) (finding that the plaintiff's attempt to characterize a negligence claim as a contract claim did not "in of itself, create a genuine issue of material fact appropriate for a jury's consideration").

In differentiating between contract and tort actions, the Superior Court of Pennsylvania has explained that "the latter lie from the breach of duties imposed as a matter of social policy while the former lie for the breach of duties imposed by mutual consensus." *Redevelopment*

*Auth. of Cambria Cnty. v. Int'l Ins. Co*., 685 A.2d 581, 590 (Pa. Super. Ct. 1996.)  In applying the doctrine, and determining whether claims of tort and contract should be permitted based on the same underlying conduct, courts are "concerned with the nature of the action as a whole." *Am. Guar. & Lia. Ins. Co. v. Fojanini*, 90 F. Supp. 2d 615, 622 (E.D. Pa. 2000).  Here, Plaintiffs allege that Agusta Corp. breached its contractual duty to comply with standards of care set forth in the FARs.  However, as Plaintiffs acknowledge, the central purpose of the FARs is the promotion of national air safety, as well as the protection of pilots, passengers, and persons on the ground.  (Pls.' Resp. to Agusta 39.)  Certainly, the duties set forth in furtherance of this goal qualify as matters of social policy rather than a mere consensus among parties.  Therefore, Plaintiffs' contractual claim is barred by the gist of the action doctrine.

Nevertheless, to the extent that Plaintiffs' contractual claim is not barred, it fails on the merits.  As in the negligence context, Plaintiffs have failed to establish any genuine issues of material fact related to the Agusta pilots breaching of any FARs.  The Agusta pilots followed ATC guidance, kept the Grumman in sight, kept appropriate separation, and executed a quick stop when the Grumman performed an unanticipated maneuver.  Plaintiffs have not established, and cannot establish, that the Agusta pilots violated any FARs.  Accordingly, they cannot establish that the Agusta pilots violated their lease with the City of Philadelphia.  Plaintiffs' breach of contract claim against Agusta Corp. cannot proceed.

# IV. CONCLUSION

For all of these reasons, the United States of America and Agusta Aerospace Corporation's Motions for Summary Judgment will be granted.

An appropriate Order follows.

BY THE COURT:

_____
**R. BARCLAY SURRICK, J.**